No. 02-079

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 338

STATE OF MONTANA,

       Plaintiff and Respondent,

   v.

TROY RAY GARDNER,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Sixth Judicial District,
In and For the County of Park, Cause No. DC 2000-09,
Honorable Wm. Nels Swandal, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Jeannette Ellen Berry, Attorney at Law, Bozeman, Montana

      For Respondent:

          Honorable Mike McGrath, Attorney General; Tammy K. Plubell,
Assistant Attorney General, Helena, Montana

          Tara DePuy, County Attorney, Livingston, Montana

      For Amicus Curiae:

          Kirsten H. LaCroix, Deputy Missoula County Attorney, Missoula,
Montana (For Montana County Attorney's Association)

Submitted on Briefs:  August 15, 2002

Decided:  December 11, 2003

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1     Appellant Troy Ray Gardner appeals the final judgment entered by the Sixth Judicial District Court, Park County, finding him guilty of incest, a felony.  We affirm.

¶2     The following issues are presented on appeal:

¶3     1.  Did the District Court err in denying Gardner's motion to suppress the child's testimony as tainted?

¶4     2. Was there sufficient evidence to sustain Gardner's conviction?

¶5     3. Did the District Court err in allowing rebuttal testimony offered by the State?

¶6     4.  Did the District Court err by instructing the jury to ignore testimony of a police officer concerning the child's truthfulness?

¶7     5.  Did the District Court err in allowing testimony by a police officer who stated that, according to his use of the Reid Technique, Gardner was lying in his interviews?

## FACTUAL AND PROCEDURAL BACKGROUND

¶8     On February 17, 2000, Gardner was charged by Information with four counts of incest with his daughter K.G. in violation of § 45-5-507,  MCA.  On December 29, 2000, the State amended the Information charging him with a single count of incest.

¶9     Troy Ray Gardner (Gardner or father) and Raeann Vernia (Vernia or mother) were married in 1991 and had a daughter, K.G.  In 1993, Vernia and Gardner divorced.  Pursuant to an agreement, K.G. was to live with her mother for eight months of the year and her father for four months; however, Gardner rarely saw K.G. in the years following the divorce because he was in the military service.  This continued for approximately five years until

2

Vernia suggested that Gardner spend more time with K.G. After Gardner left the military and was living again in Montana, K.G., then approximately seven years old, began having some overnight visits with her father about once a month.

¶10 On August 12, 1999, K.G. had a roller skating accident in which she injured her genital area on a banister of the porch at her home in Livingston. When Vernia put K.G. in the bathtub to soothe her injury, K.G. asked her mother to inspect her vaginal area. Vernia stated K.G.'s vaginal area appeared bruised, swollen, and chafed. Vernia told K.G. she really did not think the bruising had just happened, and asked if her "dad or someone else" had done something to her. K.G. started crying and responded that her dad had "hit her and rubbed her there."

¶11 Vernia took K.G. to the Livingston Police Department where Vernia gave a voluntary written statement alleging incest by Gardner. Vernia then took K.G. to the Livingston hospital emergency room where the child was examined and questioned by Dr. Burwell, the ER physician. Dr. Burwell's assessment of the child's injury was that the physical evidence was consistent with either a straddle injury or sexual abuse.

¶12 The following day, August 13, 1999, K.G. was interviewed twice by Officer Severson of the Livingston Police Department. The investigation was then turned over to the Park County Sheriff's Department because K.G. reported the abuse had occurred at the family ranch in Clyde Park. K.G. was interviewed again on September 9, 1999, by Detective Steffins. Two of the three interviews of the child were taped.

3

¶13    On September 22, 2000, Gardner filed a motion to suppress all pretrial statements and exclude any trial testimony by the child witness as "irrevocably tainted," and a motion to dismiss the Information. In the alternative, Gardner's motion to suppress requested a taint hearing, pursuant to Rule 104, M.R.Evid., before determining the admissibility of such evidence. Gardner asserted that unnecessarily suggestive interviewing techniques by police had tainted the child's statements and rendered them unreliable, thus constituting a substantive due process violation under both the United States and the Montana constitutions.

¶14    On November 1, 2000, the District Court conducted a "taint hearing" to determine whether the child's testimony had been rendered irremediably unreliable by the investigative process. On November 15, 2000, the District Court denied both the motion to suppress and motion to dismiss.

¶15    Following a jury trial from January 10 through January 13, 2001, the jury returned a verdict of guilty.

¶16    On February 9, 2001, Gardner filed a motion for judgment of acquittal notwithstanding the verdict, attacking the victim's credibility, criticizing the police investigation, and asserting that no medical evidence existed to support an allegation of sexual abuse. On April 25, 2001, the District Court entered its order denying Gardner's motion, stating:

> [T]he jury listened to the defendant and the victim testify, listened to the defendant's expert witness, and the defendant was allowed liberal cross-examination of the officers who conducted the various interviews.

4

While the defendant rails against the law enforcement interviews and how they "tainted" the victim's testimony, this Court does not agree. The interviews were not ideal, but it does not appear that they had an impact on the victim's testimony. As the Court noted when ruling on a prior motion the victim's statement remained basically consistent from her initial disclosures to her mother and Dr. Burwell. This was before law enforcement got involved. After weighing all the evidence the jury obviously decided that the victim's testimony was more credible than that of the defendant.

¶17 On November 5, 2001, the District Court entered its judgment deferring imposition of sentence for five years and imposing numerous conditions on the deferral. Gardner appeals.

## DISCUSSION

¶18 As a preliminary matter, the State urges this Court to rule that Gardner's appeal is defective and, therefore, not properly before the Court. The State argues that Gardner's notice of appeal, which simply states that he is appealing "from the final judgment," violates Rule 4(c), M.R.App.P., which requires the notice must designate "the judgment, order or part thereof appealed from." The State contends that Gardner's challenges to pre-judgment issues were not preserved by his notice of appeal.

¶19 Gardner counters that his notice of appeal properly raises all of his issues on appeal pursuant to § 46-20-104, MCA, which delineates the scope of an appeal by a defendant. Section 46-20-104, MCA, states:

(1) An appeal may be taken by the defendant *only from a final judgment of conviction and orders after judgment* which affect the substantial rights of the defendant.

(2) Upon appeal from a judgment, the court may review the verdict or decision *and any alleged error* objected to which involves the merits or necessarily affects the judgment. Failure to make a timely objection during

5

trial constitutes a waiver of the objection except as provided in 46-20-701(2). [Emphasis added.]

In support of its contention that Gardner's notice of appeal is deficient, the State cites *State v. Spotted Blanket*, 1998 MT 59, 288 Mont. 126, 955 P.2d 1347, and *State v. Delap* (1989), 237 Mont. 346, 772 P.2d 1268. However, in both of these cases the notice of appeal specifically designated one ruling, but argument on appeal was made for another, and, therefore, this Court, pursuant to Rule 4(c), M.R.App.P., declined to hear the new issue because it was not specified in the notice of appeal. *Spotted Blanket*, ¶ 12; *Delap*, 237 Mont. at 351, 772 P.2d at 1271. That is not the case here. We agree that, under § 46-20-104(2), MCA, Gardner's notice of appeal "from the final judgment" is not deficient, and his appeal properly encompasses the issues he raises.

**Issue 1**

**¶20     Did the District Court err in denying Gardner's motion to suppress the child's testimony as tainted?**

**Standard of Review**

¶21     On appeal, this Court treats a district court's denial of a motion to suppress the testimony of a witness as a ruling on the admissibility of evidence. *State v. Bingman*, 2002 MT 350, ¶ 19, 313 Mont. 376, ¶ 19, 61 P.3d 153, ¶ 19. The standard of review for a district court's evidentiary rulings is abuse of discretion. Absent a showing of such abuse, the Supreme Court will not overturn the district court's decision. *Bingman*, ¶ 19.

**Discussion**

¶22   Gardner alleges the District Court erred in denying his motion to suppress the child's pretrial and trial testimony as tainted. Memory "taint" occurs when children's memories "have been falsified by suggestion in the course of interviews and pretrial preparations." John R. Christiansen, *The Testimony of Child Witnesses: Fact, Fantasy, and the Influence of Pretrial Interviews*, 62 Wash. L. Rev. 705, 707 (1987). If a child's memory is tainted by the investigation process, the potential exists that the child may give unreliable or false statements.

¶23   Montana has not adopted the "taint hearing" as a necessary or required procedure in child sexual abuse cases. The State challenges the notion that taint hearings should be conducted at all. Similarly, Amicus County Attorney Association also argues against adopting taint hearings.

¶24   We affirm the District Court's decision denying the defendant's motion to suppress and motion to dismiss. However, we decline to address the broader issue of whether taint hearings are required under Montana law. The State did not cross-appeal the District Court's holding of a taint hearing; thus, the issue is not properly before the Court.

¶25   Although not required to do so by current law, the District Court conducted a taint hearing to determine whether K.G.'s testimony was rendered irremediably unreliable by the investigative process. The District Court denied both the motion to suppress the testimony, and the motion to dismiss, stating:

> Whether the interview techniques were flawed or improper goes to the weight
> and not the admissibility of the statements. The Court does not find that the

7

alleged improper techniques render the statements so unreliable that they should not be presented to a jury. The jury will be capable of weighing the evidence and determining what weight, if any, to be given to the victim's testimony.

¶26 Reviewing this matter as an evidentiary issue, we conclude that the District Court's denial of the defendant's motions was not an abuse of discretion. The court heard testimony from both Vernia and K.G. that no strife existed between Vernia and Gardner over custody and visitation issues, thus dispelling the concern that Vernia had been motivated to coax an adverse statement from the child about her father. Although Gardner alleges K.G.'s testimony was tainted by improper interviewing techniques, the officers testified that they did not have a preconceived opinion as to what happened; that they asked repetitious questions because K.G. was a child and they wanted to be clear on what she said; and that they did not have a sense that K.G. was giving "wrong" answers. Officer Steffins stated that even in the presence of leading, repetitious, and yes-no questions, K.G. had corrected him a number of times when he misunderstood or made a misstatement, and he did not believe this child had been influenced by suggestive comments. The court also heard testimony from Dr. Sarah M. Baxter, an expert witness in the area of child sexual abuse, who stated that leading and repetitious questions are more dangerous for preschool age children than grade school children like K.G., and that these kinds of questions are less of a concern for children with good cognitive skills like those possessed by K.G. Before rendering its decision, the court received, listened to, and reviewed the transcripts of the two recorded interviews of the child.

8

¶27 We conclude that the District Court's denial of Gardner's motion to suppress and motion to dismiss was not an abuse of discretion.

**Issue 2**

**¶28 Was there sufficient evidence to sustain Gardner's conviction?**

**Standard of Review**

¶29 The standard of review for sufficiency of the evidence to support a jury verdict is "to determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Bauer*, 2002 MT 7, ¶ 15, 308 Mont. 99, ¶ 15, 39 P.3d 689, ¶ 15. A directed verdict of acquittal is appropriate only when there is no evidence to support a guilty verdict. *Bauer*, ¶ 15. This Court has held repeatedly that "a conviction for a sex offense may be based entirely on the uncorroborated testimony of the victim," regardless of whether the victim is a child. *Bauer*, ¶ 15 (citing *State v. Olson* (1997), 286 Mont. 364, 372, 951 P.2d 571, 576; *State v. Gilpin* (1988), 232 Mont. 56, 70, 756 P.2d 445, 453; *State v. Maxwell* (1982), 198 Mont. 498, 503, 647 P.2d 348, 351; *State v. Metcalf* (1969), 153 Mont. 369, 378, 457 P.2d 453, 458). The credibility of witnesses and the weight to be given to their testimony are determined by the trier of fact, and disputed questions of fact and credibility will not be disturbed on appeal. *Bauer*, ¶ 15.

**Discussion**

¶30 Gardner argues that the evidence produced at trial was insufficient to support the jury's guilty verdict. K.G.'s testimony served as the basis for Gardner's conviction. K.G. testified at trial that on three or four different occasions at the family ranch, while Gardner read her a bedtime story, Gardner had rubbed her softly with his hand in the area of her privates as the two of them lay on K.G.'s bed. K.G. testified that the rubbing lasted approximately five minutes, during which time she tried to ignore it, then asked Gardner to stop. K.G. testified that Gardner stopped when she asked him to. He then finished reading the story, walked out of the room quietly, and went downstairs.

¶31 K.G. stated she told her mother about the rubbing at the time of the roller skating injury when she was in the bathtub, and that she was afraid and nervous about telling her mother because she did not know what was going to happen. Vernia said that when she asked K.G. how long this had been going on, K.G. said, "for a long time." When Vernia then asked K.G. how many times this happened, she responded, "at least five times." At trial, K.G. testified that it had happened "three or four" times. Dr. Burwell, the ER physician, testified that K.G.'s injuries were consistent with either a straddle injury from hitting a banister during a roller skating accident or from sexual abuse.

¶32 Gardner testified at trial that he never touched his daughter in a sexual manner. Testimony by Gardner's girlfriend and many of Gardner's relatives who were at the family ranch during K.G.'s visits with her father testified they never saw anything untoward or any hesitation between K.G. and her father. Gardner told the jury, however, that he believed

10

K.G. had been sexually abused and that his daughter was very honest. Additionally, Gardner told police during the pretrial interviews and at trial that there were times when he had been alone upstairs with his daughter.

¶33 Dr. Baxter testified that even interviews conducted by highly skilled individuals are subject to criticism because interviewing children is very difficult. According to Baxter, there was no such thing as a perfect interview. Dr. Baxter agreed that K.G. demonstrated consistency when confronted with leading and repetitive questions and demonstrated that she was not susceptible to "suggestibility" in that she had not incorporated new details into her facts each time she was questioned.

¶34 Gardner was given every opportunity to expose any weaknesses in the interviews and the investigatory process to the jury. Gardner's allegations in conflict with K.G.'s testimony constituted questions for the trier of fact, which the jury resolved against him. We are unwilling to second-guess the jury in these factual matters. Thus, we hold that, viewing the evidence in the light most favorable to the prosecution, a rational jury could have found the essential elements of incest beyond a reasonable doubt.

## Issue 3

**¶35 Did the District Court err in allowing rebuttal testimony offered by the State?**

**Standard of Review**

¶36 "Rebuttal evidence offered by the State is admissible if it has a tendency to contradict or disprove evidence of the defense." *State v. Love* (1968), 151 Mont. 190, 196, 440 P.2d 275, 279. "Rebuttal testimony is proper only if it tends to counteract a new matter offered

by the adverse party." *State v. Hart*, 2000 MT 332, ¶ 20, 303 Mont. 71, ¶ 20, 15 P.3d 917, ¶ 20. This Court "will review a district court's admission of rebuttal testimony to determine whether the district court abused its discretion." *Hart*, ¶ 20.

**Discussion**

¶37 Gardner contends the District Court committed reversible error in allowing rebuttal testimony offered by the State. Specifically, Gardner alleges that it was error for the District Court, over his objection, to allow the State to recall Vernia and her friend, Shannon Hamilton, to give rebuttal testimony.

¶38 In the State's case-in-chief, Vernia testified that during one of K.G.'s visits to her father when he was employed at a veterinarian clinic in Bozeman, K.G. called and requested that Vernia come and pick her up early. K.G. told Vernia that her father had scared her, but offered no further explanation at that time. K.G. testified she could not remember why she got scared. During Vernia's direct examination, Vernia testified that K.G. had told her that the touching of K.G.'s genital area by her father had first started when K.G. called her, upset, from Bozeman.

¶39 During the defendant's case-in-chief, Gardner offered his explanation as to why K.G. was frightened and called her mother to come and pick her up. Gardner explained that when a bloody colt arrived at the vet clinic in need of immediate care, K.G. wandered into the pen where the injured animal was being treated. According to Gardner, as he assisted the vet who was attending the colt, he raised his voice at K.G. and instructed her to go outside the

12

pen in an attempt to protect her.  Gardner testified that he had a deep voice that could be intimidating.

¶40    The District Court then permitted rebuttal testimony from Vernia and Hamilton who described K.G.'s demeanor when they picked her up after her call from Bozeman.  Vernia testified that K.G. was "really upset, crying, [and] just hysterical."  Vernia also testified that K.G. curled up in a little ball and stared out the window all the way home to Livingston, and did not talk for three days.  Vernia testified that when she asked K.G. what happened, K.G. said her dad "really scared her."  Hamilton testified that after the Bozeman visit, K.G. was "very quiet and more to herself, didn't want to play, didn't want to do anything."  She had to "sleep with a bear or something" that night.

¶41    The District Court did not abuse its discretion in admitting the State's rebuttal testimony. Vernia's and Hamilton's rebuttal testimony tended to counteract the new matter offered by Gardner, that being the "bloody colt" theory of why K.G., frightened, had called her mother and asked to be picked up.  Gardner alleges the rebuttal testimony of Vernia and Hamilton "did not contain facts which in any manner serve to rebut Gardner's description of K.G. and the bloody injured colt."  However, Vernia's and Hamilton's description of K.G.'s demeanor, both when they picked her up and for the following three days, specifically, that K.G. was quiet, withdrawn, did not want to talk, and reverted back to sleeping with toys or a blanket that her grandmother made her, could be viewed as tending to contradict or disprove the theory offered by the defense and tending to counteract the "bloody colt" evidence offered by the defendant.

13

¶42    We conclude that the District Court properly acted within its discretion in allowing the rebuttal testimony offered by the State.

## Issue 4

**¶43    Did the District Court err by instructing the jury to ignore testimony of a police officer concerning the child's truthfulness?**

## Standard of Review

¶44    "It has long been the rule of this Court that on appeal we will not put a District Court in error for a ruling or procedure in which the appellant acquiesced, participated, or to which appellant made no objection." *In re Marriage of Smith* (1990), 242 Mont. 495, 501, 791 P.2d 1373, 1377.  "Acquiescence in error takes away the right of objecting to it." *State v. LaDue*, 2001 MT 47, ¶ 23, 304 Mont. 288, ¶ 23, 20 P.3d 775, ¶ 23; § 1-3-207, MCA.  This Court "will not hold a district court in error when it has not been given an opportunity to correct itself." *State v. Detonancour*, 2001 MT 213, ¶ 52, 306 Mont. 389,  ¶ 52, 34 P.3d 487, ¶ 52.

## Discussion

¶45    On appeal, Gardner contends the District Court's verbal instruction to the jury to ignore testimony of a police officer concerning the child's truthfulness constituted prejudicial error.  Gardner's allegation of error centers on the following exchange during the State's direct examination of Detective Steffins regarding his interview of K.G.:

Prosecutor:  How did the interview go?

Police Officer:  As far as it going, it was consistent with the interview that Detective Severson did previously.  I found no discrepancies between the two

14

interviews. [K.G.'s] story was consistent in detail, and she was very forthright, honest and truthful as far as I was concerned.

. . . .

Defense Counsel: Your Honor, I have to object.

The Court: Yeah. The jury will disregard the last statement by Detective Steffins.

Defense Counsel: On the grounds that he's not qualified to make that observation.

The Court: He's not qualified to make that determination. That's a jury question.

When Steffins offered the opinion that K.G. was "very forthright, honest and truthful," defense counsel objected on the grounds an untrained officer was not qualified to make this observation. The court sustained the objection and immediately admonished the jury to disregard the statement. Throughout the remainder of the trial, Gardner neither made further objection regarding the testimony nor indicated that the court's admonition did not cure the evidentiary error. Gardner did not move for a mistrial.

¶46 On appeal, Gardner asserts prejudicial error on the grounds the only person who can speak directly to the credibility of a child witness is an expert who has been qualified under the standards set forth in *State v. Scheffelman* (1991), 250 Mont. 334, 342, 820 P.2d 1293, 1298. Gardner contends that Officer Steffins could not meet these criteria, thus, his testimony should have been inadmissible.

¶47 However, the District Court sustained Gardner's objection regarding the alleged inadmissible testimony and admonished the jury to disregard it. Because Gardner did not

15

further object or move for a mistrial, the District Court was not placed on notice that Gardner believed the error had not been cured, and was not given an opportunity to correct itself. Gardner's acquiescence in the District Court's admonition constitutes a waiver of his right to assert error regarding this issue on appeal. Thus, we decline to consider it.

## Issue 5

**¶48 Did the District Court err in allowing testimony by a police officer who stated that, according to his use of the Reid Technique, Gardner was lying in his interviews?**

### Standard of Review

¶49 In order to properly preserve an issue for appeal, a defendant must make a timely objection or motion to strike. *State v. Stuit* (1994), 268 Mont. 176, 182, 885 P.2d 1290, 1294. One "must object to improper testimony when it is offered or abide the result; failure to object at the proper time waives the error." *State v. Lawrence* (1997), 285 Mont. 140, 163, 948 P.2d 186, 200.

### Discussion

¶50 Gardner alleges that the District Court committed reversible error in allowing Detective Steffins to testify that, according to the "Reid Technique," Gardner was lying in his interviews. During direct examination by the State, Steffins testified that the Reid Technique, a technique used for interviewing criminal suspects, demonstrates that a person who is lying will "soften" over time, give qualified answers, transfer blame to others, appeal to a higher (divine) authority, and try to avoid getting "boxed in" with an answer.

¶51 On the first day of trial, Steffins described his observations of Gardner during two interviews he conducted of him. Steffins stated that Gardner gave qualified answers, was

16

evasive, shifted blame, tried to justify incriminatory actions through loss of memory while conversely saying he had an excellent memory, made a statement of denial akin to swearing on a stack of Bibles, tried to keep from getting boxed in on specific dates, and "softened" at the end of the interview by saying he just did not remember when or where the alleged inappropriate contact happened.

¶52 As the State correctly notes, defense counsel made no objection to any of Steffins' testimony when it was offered on the first day of trial and did not cross-examine Steffins at that time. Instead of proceeding with cross-examination, defense counsel informed the court that Steffins had been subpoenaed for Gardner's case-in-chief, and, therefore, the defense would conduct direct and cross-examination of Steffins later in the trial.

¶53 On the third day of trial, defense counsel called Steffins during its case-in-chief and challenged him regarding his training, interview techniques, and assessment of Gardner. Defense counsel then asserted Steffins' training, which consisted of only twenty-four hours of instruction in the use of the Reid Technique, did not qualify him to make "extreme psychological judgments" about Gardner, thus rendering his observations of Gardner and his conclusion that Gardner was lying, inadmissible opinion testimony, and moved to strike all of Steffins' testimony on grounds he did not meet the qualifications necessary for an expert witness in the area of psychology. The court denied the motion to strike, stating that although Steffins was not an expert in psychology, Steffins could base his opinion on his training and the interviews he had done over the years as a police officer, and that the credibility and weight of the officer's testimony would be a jury question.

¶54    The State contends that Gardner did not preserve the issue for appeal.  In support of

this contention the State cites *State v. Lawrence* for the proposition that objections to

improper testimony must be timely, and failure to make a timely objection waives the error.

¶55    We agree.  Rule 103 of the Montana Rules of Evidence pertaining to evidentiary

rulings states in pertinent part:

> (a)  Effect of Erroneous Ruling.  Error may not be predicated upon a
> ruling which admits or excludes evidence unless a substantial right of the party
> is affected, and
>
> (1)  *Objection.*  In case the ruling is one admitting evidence, a *timely
> objection or motion to strike* appears of record, stating the specific ground of
> objection, if the specific ground was not apparent from the context. . . .
> [Emphasis added.]

Rule 103, M.R.Evid.

¶56    The requirement of timely objections has been the rule in Montana since the early

1900s.  In *Yoder v. Reynolds* (1903), 28 Mont. 183, 72 P. 417, this Court held the fact the

plaintiff sat by and allowed alleged inadmissible testimony go to the jury without objection

waived the error.  The *Yoder* court noted, "[i]t is the settled law that one must object to

improper testimony when it is offered, or abide the result." *Yoder*, 28 Mont. at 194, 72 P. at

419.  Similarly, in *Poindexter & Orr Live Stock Co. v. Oregon Short Line R. Co.* (1905), 33

Mont. 338, 83 P. 886, this Court held the lower court did not err in refusing to strike

evidence where plaintiff's counsel sat by and permitted the evidence to be heard without

objection. The *Poindexter* court stated, "[t]he practice, whether in civil or criminal cases, of

deliberately permitting evidence to be given without objection in the first instance, and then

moving to strike it out on grounds which might readily have been availed of to exclude it when offered, is not to be tolerated." *Poindexter*, 33 Mont. at 341, 83 P. at 887.

¶57    Here, as in *Poindexter*, Gardner's counsel made a strategic decision not to object when the alleged inadmissible testimony was offered on the first day of trial. Instead, defense counsel chose to wait until the third day of trial to attempt to discredit Steffins' ability to give such testimony, and to move to strike, which the District Court overruled. By doing so, Gardner failed to preserve this issue for appeal.

¶58    Gardner cites *State v. Whitlow* (1997), 285 Mont. 430, 442, 949 P.2d 239, 247, for the premise that, where a defendant does not object to alleged inadmissible testimony during the State's case-in-chief, but waits to do so later during cross-examination, the error is nonetheless preserved for appellate review. In *Whitlow*, defense counsel waited until his cross-examination of a witness before raising an objection to the witness's testimony. The Court, although citing the established rule that objections must be timely made, nonetheless chose to address the challenged testimony on the merits of the issue, and affirmed the conviction. *Whitlow*, 285 Mont. at 442, 949 P.2d at 247. However, whatever flexibility in the timing of an evidentiary objection may have been bestowed by *Whitlow* cannot be stretched into a delay of two days after the evidence has been presented to the jury. By then, the challenged evidence will have been deeply implanted into jurors' memories under layers of new testimony, and any attempt by the trial judge to honor an objection by striking the then-distant testimony would be a difficult endeavor, well illustrating the purpose served by the rule.

19

¶59 As expressed in *Poindexter*, adherence to the longstanding rule requiring timely objections is necessary: the issue will not be deemed preserved for appellate review where counsel sits by and permits evidence to be given without objection in the first instance, and then moves to strike on grounds which were manifest and available at the time the evidence was first offered. Thus, we decline to consider Gardner's issue on appeal.

¶60 We affirm the judgment of the District Court.


/S/ JIM RICE


We concur:


/S/ JIM REGNIER
/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART

[end]